IN THE MATTER OF THE PROBATE OF THE ALLEGED WILL OF WILLIAM G. BLAKE, DECEASED.

LOUIS J. BEERS, PROPONENT-RESPONDENT, v. FLORENCE E. McCONNELL, CAVEATRIX-APPELLANT.

Argued January 9, 1956—Decided February 20, 1956.

*Mr. Fremont D. Donley* argued the cause for the appellant caveatrix, Florence E. McConnell.

*Mr. Herman J. Harris* argued the cause for the respondent proponent of the will, *Louis J. Beers.*

The opinion of the court was delivered by

HEHER, J. The issue here concerns the legal sufficiency of a paper writing bearing date June 7, 1954, purporting to be the last will of William G. Blake, who died July 23 ensuing. It is conceded there was due execution of the instrument as a testamentary disposition of an estate amounting to $17,000. In the Probate Division of the Essex County Court and the Appellate Division of the Superior Court the caveatrix, Florence E. McConnell, the deceased's niece, pleaded the want of testamentary capacity and, on the contrary hypothesis, the procuring of the will by undue influence exercised by the lawyer-draftsman, Louis J. Beers, who was named as sole beneficiary and executor.

█ The County Court, Judge Cafiero sitting, refused probate. The Appellate Division of the Superior Court, Judge Freund dissenting, reversed the judgment and directed probate of the instrument, holding that the deceased had testamentary capacity and the "proponent's evidence completely rebutted the presumption of undue influence." 37 *N. J. Super.* 70 (*App. Div.* 1955). The case is here on an appeal of right taken by the caveatrix under *Article* VI, *Section* V, *paragraph* 1(*b*) of the 1947 *Constitution.*

There is no contention now of testamentary incapacity when the will was made. The brief tendered by the caveatrix does not raise the question; and it was not presented on the oral argument. The insistence is that since "the proponent of the will is an attorney who drew the will and is also the sole beneficiary thereunder," there is a presumption of undue influence and the burden of refuting it has not been sustained.

It is said in argument that "all reasonable presumptions and intendments consistent with the record will be indulged in favor of the validity of the judgment" denying probate, and, moreover, the "credibility of witnesses is a subject matter wholly within the province of the trial judge, and as long as there is testimony in support of his factual findings it should not be disturbed." "Testimony neutralizing the presumption," it is affirmed, "is not sufficient; the presumption must be completely overcome and, to achieve that end, the testimony must be clear, impeccable and convincing."

█ The burden of proof in the sense of the risk of nonpersuasion rests with the contestant who would deny probate for undue influence; and, though the burden in this regard does not shift where there is a confidential relationship, such as the relation of attorney and client between the draftsman and sole beneficiary of the paper writing tendered for probate and the maker of the instrument, yet in such case circumstances suggestive of inequality, unfairness, imposition, or overreaching give rise to a presumption of undue influence, and there is cast upon the proponent attorney-beneficiary the burden of coming forward with evidence in quality and force sufficient to dispel the presumption. In such a confidential

relation "slight circumstances" may shift the burden. *In re Davis' Will,* 14 *N. J.* 166 (1953) ; *In re Hopper's Estate,* 9 *N. J.* 280 (1952) ; *Gellert v. Livingston,* 5 *N. J.* 65 (1950) ; *In re Heim's Will,* 136 *N. J. Eq.* 138 (*E. & A.* 1945) ; *In re Nixon's Will,* 136 *N. J. Eq.* 242 (*E. & A.* 1945) ; *In re Neuman's Estate,* 133 *N. J. Eq.* 532 (*E. & A.* 1943) ; *In re Bottier's Estate,* 106 *N. J. Eq.* 226 (*Prerog.* 1930) ; *In re Morrisey's Will,* 91 *N. J. Eq.* 480 (*Prerog.* 1920) ; *In re Cooper's Will,* 75 *N. J. Eq.* 177 (*Prerog.* 1908).

 Against a beneficiary "having a testator under his control, with power to make his will the will of the testator, especially in a case where the testator has made an unnatural and unjust disposition of his property, the law wisely presumes undue influence, and puts upon the beneficiary the burden of showing, affirmatively, that when the testator made his will he did not exercise his power over the testator to his own advantage and to the disadvantage of others having an equal or superior claim upon the bounty of the testator." *Carroll v. Hause,* 48 *N. J. Eq.* 269 (*Prerog.* 1891).

 But in the very nature of the term, influence is not undue in this regard unless it constitutes moral or physical coercion destructive of free agency. Even persuasion, much less mere suggestion, is not undue influence either in the legal or the moral sense if freedom of will remains intact.

"It is not the influence acquired by kind offices, or even by persuasion unconnected with fraud or contrivance ; though if persuasion or other means of influence be connected with fraud, it may admit of a far different consideration. Fraud may be employed as means of influencing, and may afford ground for impugning a testamentary act no less than force, and the peculiar relation between the testator and the party benefited, as client and attorney, &c., when the former was weak and liable to imposition, has been held to furnish strong presumptions in regard to undue influences.' *Den ex dem Trumbull v. Gibbons,* 22 *N. J. L.* 117, 158 (*Sup. Ct.* 1849).

But to "attempt to persuade a testator, however, is treading upon dangerous ground, for the result may be that he will be led to assent to that which, of his own free will, he would

not have assented to. It is impossible to distinguish, by a fixed rule, between acts which are within the bounds of legitimate influence and acts which make the influence undue. Similar acts may be trifling and of no importance in the case of one person, and overmastering in the case of another. Their effect must depend upon the relations between the parties, and the character, strength and condition of each, and must be determined by the application of sound sense to the facts of each given case." *Elkinton v. Brick,* 44 *N. J. Eq.* 154, 166 (*Prerog.* 1888).

A will cannot be set aside merely because it is "unequal or unjust." "If capacity, formal execution, and volition appear, the will of the most impious man must stand, unless there is something, not in the motives which led to the disposition, but in the actual disposition, against good morals or against public policy." *Den ex dem Trumbull v. Gibbons,* cited *supra,* 22 *N. J. L.,* at *page* 153. If the *animus testanti* be established, then fulfillment of the declared testamentary purpose becomes a peremptory judicial duty, unless the requisites of form and execution have not been met. If there be mental capacity and freedom of will, the testamentary disposition prevails as the exercise of a right of ancient origin confirmed and regulated by the Statute of Wills. It is fundamental that whatever may be the quality and scope of the legislative power to regulate and control the testamentary transfer of property, there is no judicial superintendence of the reason and wisdom of the testamentary act, save as it offends against positive law or imperative public policy. See *United States v. Burnison,* 339 *U. S.* 87, 70 *S. Ct.* 503, 94 *L. Ed.* 675 (1950). Undue influence is in a sense related to capacity, for one under constraint destructive of free will is not possessed of capacity for the particular testamentary act. The voluntariness of the act is the essential point in issue. There may be weakness of intellect and will, as a result of age or disease, that makes for ready submission to the importunities of the one who has dominance in virtue of the trust relation. The question is whether there was a free exercise of judgment and discretion.

█ █ The presumption of undue influence arising from a confidential relation is not in itself evidence. It is neutralized by countervailing evidence—overborne by substantial and trustworthy evidence of explanatory facts to the contrary. The presumption is not the fact in itself, nor the inference itself, but the legal consequence attached to it. A presumption of law compels the particular conclusion in the absence of evidence *contra; e converso,* it disappears as a rule of law upon the introduction of substantial evidence by way of contradiction or explanation. But where the legal procedural consequence is thus removed by the presentation of evidence to the contrary, the inference, as a matter of reasoning, may still remain, to be assayed for its intrinsic worth alone, without any artificial probative effect. This is sometimes loosely called a "presumption of fact," which signifies merely the rational potency or probative value of the evidentiary fact, *i. e.,* its natural force and efficacy in generating belief or conviction in the mind. *Meltzer v. Division of Tax Appeals,* 134 *N. J. L.* 510 (*Sup. Ct.* 1946), citing *Wigmore on Evidence* (*3d ed.*), *section* 2491. See *R. v. Almon, 5 Burr.* 2686, 2688 (1770), Lord Mansfield; *Greenleaf, Evidence, section* 44.

█ In a word, a presumption is not to have artificial evidential weight; yet the finder of the facts may draw the natural and logical inferences from the facts which constitute the basis of the presumption. *New York Life Insurance Co. v. Gamer,* 303 *U. S.* 161, 58 *S. Ct.* 500, 82 *L. Ed.* 726 (1938), 114 *A. L. R.* 1218. Presumptions "are artificial rules which have a legal effect independent of any belief, and stand in the place of proof until the contrary be shown." *Smith v. Asbell, 2 Strob.* 141, 147 (*S. C. Ct. App.* 1846). See also *Commercial Molasses Corporation v. New York Tank Barge Corporation,* 314 *U. S.* 104, 62 *S. Ct.* 156, 86 *L. Ed.* 89 (1941), Stone, C. J., holding that the burden of proof "in a litigation, wherever the law has placed it, does not shift with the evidence." When substantial evidence contrary to a presumption is introduced, "the underlying facts that originally raised the presumption may or may not retain

some degree of probative force as evidence but they no longer have any artificial or technical force." *Harlem Taxicab Ass'n. v. Nemesh,* 89 *U. S. App. D. C.* 123, 191 *F. 2d* 459 (*D. C. App. Ct.* 1951). The distinction is between a bare "presumption" and a rational inference from proven facts. *Commercial Molasses Corporation v. New York Tank Barge Corporation,* cited *supra.*

The principle is embodied in the *American Law Institute's Model Code of Evidence. Rule* 704 affirms, with one exception not material here, (1) that when the basic fact of a presumption has been established in an action, the existence of the presumed fact must be assumed unless and until evidence has been introduced which would support a finding of its nonexistence or the basic fact of an inconsistent presumption has been established; and (2) when the basic fact of a presumption has been established in an action and evidence has been introduced which would support a finding of the nonexistence of the presumed fact or the basic fact of an inconsistent presumption has been established, the existence or nonexistence of the presumed fact is to be determined exactly as if no presumption had ever been applicable in the action.

 Here, the burden of adducing evidence sufficient in quality to overcome the presumption of undue influence has not been sustained. There has not been the candid and full disclosure requisite to dispel the presumption of constraint of will and volition rendering the supposed testamentary act involuntary and devoid of the *animus testandi.*

When the will was made the testator was 66 years of age, gravely ill and rapidly deteriorating from long-standing diabetes mellitus, indeed on the verge of dissolution, as the event proved. There was gangrene and a "bleeding toe," and a leg had been amputated. And there was the general debility characteristic of the last stages of the disease. A bachelor, the testator for the last 15 years of his life had lived alone in a single third-floor room of a rooming house at 19 Warren Place, in Newark. He was oppressed by loneliness; he yearned for friendship, the more so as his progressive disease

sapped his energies and added to his incapacity, and he was obsessed by the fear of complete invalidism and suffering. He died six weeks after the execution of the will, of a "cerebral vascular accident (diabetes mellitus)."

In all seeming the testator was not close to his kin, a brother and two nieces, one the caveatrix. He had contact only with the caveatrix during his latter years. Presumably, he had but small hope that the caveatrix would be able to minister unto his needs as his disability increased; and he had in mind the advantages of a "rest home." His physician, Dr. Gennell, had suggested this course; and the testator discussed it with the respondent Beers, whom he esteemed as a friend and adviser. But he was reluctant to make the change; and it is quite likely that he was not convinced the need was imminent. Nevertheless, the time had arrived for making his will. Yet he was unsettled in testamentary intention; and it would seem to be a fair assumption that he considered testamentary disposition in relation to his worsening physical condition and his future care. So far as appears, it was his first will; certainly, there had been none for some years before. His uncertainty and confusion of mind is revealed by his course of action.

The testator had made the acquaintance of Mr. John J. Smyth, a member of the New Jersey Bar, in a restaurant patronized by both on occasion; and on June 2 preceding his death he asked Mr. Smyth, in the restaurant, whether he would prepare his will and, receiving an affirmative reply, he made and kept an appointment for the afternoon of that day, when Mr. Smyth was instructed to draft a will naming the caveatrix as his sole beneficiary, for execution the following day. Mr. Smyth testified that he inquired of the testator as to "other members of his family" and the nature and extent of his property, and was told: "You don't have to know that. I want to leave everything to Florence E. McConnell, my niece. She is the only one that has done anything for me." On the following morning, the testator telephoned to Smyth, saying: "About that thing we were discussing, I wonder if you could put it off. I am too upset." Mr.

Smyth agreed; and the testator did not again mention the matter to him.

The testator had known the proponent Beers for 25 years, or more; as said, he had come to know him as a friend, one whose interest in him seemed to be something more than mere professional concern, one to whom he would go for counsel in time of need. And Beers was his attorney when the occasion demanded, although on the witness stand he seemed to have lost all recollection of professional engagements for the testator, even a partition suit brought in his behalf several years before, to which the caveatrix was a party defendant, later explaining he had made no charge for legal services rendered the testator, in this or any other matter, which is not altogether credible. But there was the social element in their relations, fostered by Beers; and the result was fairly frequent calls by the testator to the office of Beers, unrelated to professional affairs. The friendship was gratifying to this lonely man. Among his papers after death there was a $1,000 life insurance certificate issued to him October 17, 1949, when he was in the employ of the Ronson Art Metal Works of Newark, under an employees' group insurance plan, payable to Beers as beneficiary. The certificate was effective without change of beneficiary when death came, although Beers mistakenly believed it had lost its efficacy by the termination of the testator's employment; and payment has been made to him. There can be no doubt of an intimacy of relation beyond the professional, a circumstance bearing strongly upon the confidence, dependence and sense of reliance inspired by the association.

The proponent testified that the testator called at his office on the very day, it would seem, of his instruction to Mr. Smyth, in his office, to prepare a will naming the caveatrix as his sole beneficiary, in fulfillment of what seemed to be a settled intention, and made known a set purpose to designate him, Beers, his sole testamentary beneficiary and asked that he draft a will accordingly. He quoted the testator thus: "I want very little money spent for my burial, because they don't pay any attention to me. I have a bleeding toe

and an artificial limb and diabetes, and it may be disturbing to them, but they don't want anything to do with me. And I want you to draw my will. I want to leave everything to you." "And he repeated," Beers said, "that he didn't want me to spend much money for his burial." Beers told him he "would have the will prepared; it wasn't just convenient then, and he could come in." This call was made "early in June," "just before the 5th of June." The will was to be executed on the 5th, but the testator did not "come in; he came in on the 7th," in the absence of Beers. The secretary of an office associate of Beers, acting on his instructions, handed the draft of the will to the testator for his examination; and, after reading it, according to the secretary, he said: "That is fine. That is what I want." Upon the arrival of Beers, the will was executed, after it had been read aloud to the testator and approved by him as to content, in the presence of the subscribing witnesses, the secretary referred to and Beers' nephew, an insurance broker who had quarters in the office suite.

But immediately before the execution of the will, said Beers, he asked the testator: "Who are your closest relatives, the objects of your bounty, as required by law, and what you have to give away by your will, if you know?" "And then," Beers continued, "he told me that he has a niece; I think she was the daughter of a brother; and he had another brother, I believe. He referred to them as 'they,' and he referred to them more than once as 'they.' He said 'You know, because of my bleeding toe, my artificial leg, and I have diabetes, they don't seem to want to be near me, or have me near them.' "

This, notwithstanding the testator's instructions to Mr. Smyth, that very day, to draft a will naming the caveatrix as his sole beneficiary, since she "is the only one that has done anything for me." The counsel and advice given by Beers we do not know; but there can be no doubt that he was not averse to this unexpected beneficence of an obviously ailing client. His inquiry as to the natural objects of the testator's bounty was purely *pro forma;* at all events, we

are not told what the response was. It is all too evident we have not been given the whole conversation. The counsel of a trusted adviser could be overpowering to one in the throes of a fatal illness, laboring under a sense of imperative need. The testator had never before indicated to Beers an intention to name him as his testamentary beneficiary. Nor had he ever discussed with him the making of a will, Beers insisted, although it was shown that in a letter he forwarded to the testator in 1949 he suggested that "it would be a good idea to make a will." He dictated the will in question to a stenographer; he could not identify her; he did not have a secretary at the time; he used the services of a public stenographer. He did not know whether the testator was in his office when the will was "typed"; "I don't think so; I don't know; he had talked with me about making the will." And he was not "greatly surprised" when the testator informed him that he was to be the beneficiary of the will, even though they had never before discussed the making of a will. His response was that it was "very nice and generous of him." "He told me of all that I had done for him over the years. And I knew that. I wasn't so shocked, after all I had done for him in the office; let him come in. He came there with his bleeding toe and artificial limb and diabetes, and I was always very nice to him." Asked whether he inquired as to the testator's interest in charities, Beers said: "Let me see. I spoke to him about charities and told him I was going to give some money to certain charities in his name. I told him that I would do that, and he told me that he wanted me to have all the money and not spend too much for his burial. He said, 'Don't spend any money; they don't care about me.' "

Beers admitted the testator was "interested in getting into Ivy Hill," the City-owned "rest home." He quoted him thus: "They treat you so nicely there; I understand they take diabetics." Beers replied: "Yes, and I know some very fine men there, William, and I believe I can get you in." Beers said he "called a woman who has an office on Market Street and made an appointment for him"; "and

then," on the day of the execution of the will, June 7, he "tried to get him on the phone for the purpose of having him go there, and the next day, whether it's the next day, I learned that he had died of a stroke." Reminded that he died July 23, Beers simply said the testator "didn't see her; I made the appointment, and he didn't see her." Asked if he told the testator he had "enough influence to get him in there," Beers replied: "Yes. And I think he put it off, and the next thing I heard that he had died of a stroke. I think they took him to City Hospital." Asked again if the telephone call to the testator's rooming house was made on June 7, the day the will was executed, he said: "No, I don't think it was; I don't think it was. I am not sure."

The testator's landlady testified that on June 7 a man who identified himself as "Mr. Beers" (she did not know him) called on the telephone when the testator was absent and said, "When he comes in, tell him I want to see him on something important." She delivered the message when the testator came in about noon. He left immediately, and did not return until 6 P. M. She fixed the day by a notation made on a rent receipt which was the subject of controversy on that day.

The testator was aware of the execution and content of the will. The caveatrix testified that two days later, June 9, on a visit to his room, he told her he had made a will "on Friday" which "gave everything to Mr. Beers." But, she said, he expressed regret, characterizing the act as "something terrible," something he "shouldn't have done," and said, "I will get it straightened out." And while a patient at a Newark hospital, from June 13 to June 21, she said, the testator indicated "a desire to change his will," and designate her as his sole beneficiary. She was corroborated in this by her husband.

And there was corroboration by a disinterested witness, Hyland, a license inspector on the staff of the City of Newark, a life-long friend of the testator. He said the testator was "melancholy," "despondent over his condition, and he just wandered in his conversations." He told him he was "in

very great pain"; "the last two months, he complained continually about being in terrific pain"; "Several times he tried to take off a shoe and sock in the restaurant to show how his foot was bleeding"; and the witness "had to remind him that people were eating their breakfast and they didn't want to look at anything like that, and surely I didn't." In the latter part of June, "a very short time before he died," the witness testified, the testator said that he "wanted to make a will and name his niece or his cousin or somebody his beneficiary"; and he inquired as to the course to be taken supposing "there is a will already made" which was not in his possession. The witness replied: "The last will that you made is the one that counts." This latter piece of testimony was elicited by Judge Cafiero's inquiry, at the close of the cross-examination, as to whether the testator had ever discussed with him "the making of a will."

Dr. Gennell testified that the testator was "weakminded"; the nurses complained of his "behavior" in the hospital; and he talked of suicide; the mental deterioration was "more apparent during the last few months of his life"; and he doubted his testamentary capacity. During the last year of his life, the testator was hospitalized on six occasions, for varying periods of time.

Through a professional connection with the institution, Beers kept in touch with the movements of the testator in and out of the hospital, without personal contact with him; he knew of his hospitalization from June 13 to 21, after the will was made, but he was "too busy" to pay him a visit. He inquired of Dr. Gennell as to his "physical condition": he was looking for "some good news," that he would "live on," and "wasn't in any worse condition," but he was told that he "had a bleeding toe," and there was nothing "that was added to make me feel that his chances of living longer were better, or anything like that." All this from Beers himself, suggesting in the context of all the circumstances and the manner of giving the testimony that he avoided a meeting with the testator, fearing he would lose the advantage attained.

It was incumbent on the lawyer-scrivener and sole beneficiary of the testamentary act now asserted to show that the testator exercised a free and uncoerced independent judgment, such as would negative the overthrowing of free agency and the subjection of his will to the will of the draftsman, and thus to repel the presumption of undue influence by countervailing evidence; and in this he has failed. The degree of proof to that end depends on the mental state of the actor. *In re Neuman's Estate, supra*. The manifest weakness of intellect and the harassment of disease in its final stage add greatly to the weight of the burden laid upon Beers to establish as testamentary an act that by rule of positive law and the dictates of natural justice is presumed to be devoid of that quality. The "amount of undue influence" which will be sufficient to invalidate a will must, of course, "vary with the strength or weakness of the mind of the testator." *In re Putnam's Will*, 257 *N. Y.* 140, 177 *N. E.* 399, 79 *A. L. R.* 1423 (*Ct. App.* 1931). Moral compulsion or psychological pressure is enough if it subjugates the will and constrains one to do what his free will would refuse. Compare *Rubenstein v. Rubenstein*, 20 *N. J.* 359 (1956).

And even though the proponent's testimony, standing alone, be deemed sufficient to neutralize the presumption, on the whole case the inference of undue influence is clear and compelling. It is a rational deduction from the circumstances tantamount to proof of the fact.

This is a case in which witness-demeanor is of inestimable value in the assessment of the testimony. Judge Cafiero, after a searching inquiry of his own, concluded "without any hesitancy" that the testator, "ill in mind and body at the time of the execution of the will, was the subject of undue influence, or at least, that the proponent has not rebutted such presumption; * * * but on the contrary has left many things go unexplained, confused, contradicted and inconsistent, so that I can place little or no credence in what he has said or done."

Our courts have on occasion said that where a testator wishes to name his attorney or a member of his attorney's

family as a beneficiary, ordinary prudence requires that the will be drawn by some other lawyer of the testator's choosing, and thus to avoid the suspicion of an abuse of the confidential relationship. *In re Nixon's Will, supra,* Brogan, C. J.; *In re Davis' Will, supra,* where Mr. Justice Oliphant said: "Such steps are in conformance with the spirit of *Canons* 6, 11, of the *Canons of Professional Ethics* promulgated by this court." See also *In re Putnam's Will, supra. Canon* 11 declares that the lawyer "should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client." It would seem to be equally imperative that the lawyer also avoid the suspicion of benefit or gain. By the civil law a will written by a person in favor of himself was void. *Bennett v. Bennett,* 50 *N. J. Eq.* 439, 446 (*Prerog.* 1892). This, by an ordinance under Claudius, that the writer of another's will should not mark down a legacy for himself. 28 *L. R. A., N. S.,* 272. Experience is not without its lessons on the prudence of the policy.

The judgment of the Appellate Division is reversed, and the judgment of the County Court is affirmed; and the cause is remanded for proceedings accordingly.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, JACOBS and BRENNAN—4.

*For affirmance*—Justices OLIPHANT, WACHENFELD and BURLING—3.